



FILED
Jun 27 2019, 2:56 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 18S-PL-333

## Jeana M. Horner, et al.
*Appellants (Plaintiffs below)*

—v—

## Terry R. Curry, et al.
*Appellees (Defendants below)*

Argued: October 25, 2018 | Decided: June 27, 2019

Appeal from the Marion Superior Court, No. 49D06-1602-PL-4804
The Honorable Thomas J. Carroll, Judge

**Opinion by Justice Massa**

Justice Goff concurs.

Chief Justice Rush concurs in result in Part I, concurs in Part II, and dissents from Part III, with separate opinion in which Justice David joins in part.

Justice David concurs in result in Part I and concurs in Parts II and III.

Justice Slaughter concurs in the judgment with separate opinion.

**Massa, Justice.**

The Indiana Constitution imposes on the General Assembly a duty "to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." Ind. Const. art. 8, § 1. To help finance this lofty goal, our constitutional framers established a "Common School fund," the principal of which "may be increased, but shall never be diminished." *Id.* §§ 2, 3. Among other sources of revenue, this Fund "shall consist" of "all forfeitures which may accrue." *Id.* § 2.

In implementing this constitutional command, Indiana's Civil Forfeiture Statute directs the transfer of proceeds from seized property "to the treasurer of state for deposit in the common school fund." Ind. Code § 34-24-1-4(d) (2018). But before these proceeds accrue to the Fund, the Statute permits the allocation of forfeiture revenue to reimburse law enforcement costs. Whether this cost offsetting is constitutional under article 8, section 2 has been "an unresolved question" by this Court. *See Serrano v. State*, 946 N.E.2d 1139, 1142 n.3 (Ind. 2011). Today, however, we answer that question in the affirmative.

# Facts and Procedural History

In 2013, law-enforcement personnel seized two vehicles from Jeana and Jack Horner. The Marion County Prosecutor's Office filed a forfeiture action against the vehicles, claiming they had been used to transport marijuana. The Horners eventually recovered their vehicles after the underlying criminal charges were dismissed. Two and a half years later, the Horners and others sued, as "Indiana citizens and taxpayers," to "redress Marion County's profit-driven forfeiture program and to vindicate the public rights secured by Article 8 of the Indiana Constitution and the Civil Forfeiture Statute." Appellees' Supp. App. Vol. II, p.6. In their claim against the Consolidated **City** of Indianapolis and Marion

County and the Marion County **Prosecutors Office,**[1] Taxpayers sought declaratory and injunctive relief, specifically alleging that the Indiana Civil Forfeiture **Statute** unconstitutionally diverts forfeiture revenue from the Common School Fund (or simply, **the Fund**).

The Statute in force when Taxpayers sued authorized the prosecutor to file a complaint requesting the court to offset forfeiture revenue for reimbursement of case-specific "law enforcement costs." I.C. § 34-24-1-3(a) (2011). If the prosecutor succeeded in showing by a preponderance of the evidence that the property was subject to forfeiture, the court would "determine the amount of law enforcement costs" and then order any remaining proceeds which exceeded those costs to "be forfeited and transferred to the treasurer of state for deposit in the common school fund." I.C. §§ 34-24-1-4(a), (d) (2002).

In 2018, however, the Indiana General Assembly amended the Statute. *See* Pub. L. No. 47-2018, § 3, 2018 Ind. Acts 270, 273–76 (pertinent section codified at I.C. § 34-24-1-4(d)(3)). Under the new Statute—which became effective July 1, 2018—the prosecutor need not submit a formal request for the reimbursement of forfeiture-execution costs. *See* I.C. § 34-24-1-3. And instead of using the case-specific reimbursement scheme, as under the former law, the new Statute outlines a specific formula for distributing these costs. First, if the prosecutor's office employs "outside counsel" to handle the forfeiture, the proceeds pay for any attorneys' fees accrued. I.C. § 34-24-1-4(d)(3)(A). Next, one-third of the remaining proceeds "shall be deposited into the forfeiture fund established by the prosecuting attorney." I.C. § 34-24-1-4(d)(3)(B). Eighty-five percent of the residual balance then goes to either the law-enforcement office that executed the forfeiture or the state's general fund. I.C. §§ 34-24-1-4(d)(3)(C), (D). The

---

[1] Taxpayers sued several defendants that have united as two camps on appeal: (1) the Consolidated City of Indianapolis and Marion County, including Joseph Hogsett (in his official capacity as Mayor of Indianapolis), Paul Babcock (in his official capacity as Director of the Department of Public Safety), and Bryan Roach (in his official capacity as Chief of the Indianapolis Metropolitan Police Department); and (2) the Marion County Prosecutors Office, including Terry R. Curry (in his official capacity as Marion County Prosecuting Attorney).

remaining ten percent is "forfeited and transferred to the treasurer of state for deposit in the common school fund." I.C. § 34-24-1-4(d).

After the Governor signed the new Statute into law, but before it went into effect, Taxpayers moved to "amend or supplement their complaint" with a challenge to the new Statute. Appellant's App. Vol. II, p.159. Both versions of the law, they argued, violated article 8, section 2 by offsetting **any** forfeiture proceeds intended for the Fund. The trial court denied this request and later granted summary judgment for the City, concluding that the Statute was constitutional because civil forfeitures "were unknown in 1851 when Article 8, Section 2, was added to the Indiana Constitution." Appellant's App. Vol. II, p.172.[2]

Taxpayers appealed, requesting direct transfer to this Court under Appellate Rule 56(A).[3] Because this "appeal involves a substantial question of law of great public importance," *id.*, we accepted jurisdiction.

## Standard of Review

The constitutionality of an Indiana statute is a pure question of law we review de novo. *City of Hammond v. Herman & Kittle Properties, Inc.*, 119 N.E.3d 70, 78 (Ind. 2019). These statutes, however, come to us "clothed with the presumption of constitutionality until clearly overcome by a contrary showing." *Whistle Stop Inn, Inc. v. City of Indianapolis*, 51 N.E.3d 195, 199 (Ind. 2016) (internal quotations omitted).

---

[2] To be sure, the trial court's decision implicated only the 1984 Statute. But the court's rationale applies to both the 1984 and 2018 versions. And "[i]f the operation of a challenged statute is inevitable, ripeness is not defeated by the existence of a time delay before the statute takes effect." *Ind. Gas Co. v. Ind. Fin. Auth.*, 977 N.E.2d 981, 992 (Ind. Ct. App. 2012), *aff'd in part and vacated on other grounds*, 999 N.E.2d 63 (Ind. 2013).

[3] Taxpayers also requested expedited consideration under Appellate Rule 21(B), which we denied.

# Discussion and Decision

Taxpayers argue that "[b]oth versions of the Civil Forfeiture Statute violate the Indiana Constitution based on a straightforward application of Article 8." Appellants' Br. at 16. They insist that "'all forfeitures'" belong to the Common School Fund, not just a percentage of those forfeitures. *Id.* (quoting Ind. Const. art. 8, § 2).

The City counters that the legislature may define the circumstances under which forfeiture proceeds vest in the Fund and that "awards of law-enforcement costs are not forfeitures" that accrue to the state. City's Br. at 16. The Prosecutor's Office adds that the scope of article 8, section 2 does not include civil forfeitures and that, even if it did, it confers no private right of enforcement. Instead, the Prosecutor's Office asserts, the General Assembly can authoritatively define article 8, section 2's scope. Prosecutor's Br. at 21.

## I. Do Taxpayers have standing?

A threshold question for this Court is whether Taxpayers have standing to litigate their claim.

The doctrine of standing asks whether the plaintiff is the proper person to invoke a court's authority. *City of Indianapolis v. Indiana State Bd. of Tax Comm'rs*, 261 Ind. 635, 638, 308 N.E.2d 868, 870 (1974). Typically, "the party challenging the law must show adequate injury or the immediate danger of sustaining some injury." *Pence v. State*, 652 N.E.2d 486, 488 (Ind. 1995) (citing *Frothingham v. Mellon*, 262 U.S. 447 (1923)). The purpose of standing—along with the corollary doctrines of mootness and ripeness—is to ensure the resolution of real issues through vigorous litigation, not to engage in academic debate or mere abstract speculation. *Id.*

At a more fundamental level, standing implicates the constitutional foundations on which our system of government lies. By requiring a party to show a specific injury, the doctrine limits the judiciary to resolving concrete disputes between private litigants while leaving questions of public policy to the legislature and the executive. Indeed, standing "precludes courts from becoming involved . . . too far into the provinces of

the other branches." Jon Laramore, *Indiana Constitutional Developments*, 37 Ind. L. Rev. 929, 930 (2004). It is a vital element in the separation of powers, the disregard of which inevitably leads to "an overjudicialization of the processes of self-governance." Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 27 Suffolk U. L. Rev. 881, 881 (1983).

Unlike its federal counterpart, the Indiana Constitution imposes no "case or controversy" restriction on the "judicial power of the State." *Compare* U.S. Const. art. III, *with* Ind. Const. art. 7. But the express distribution-of-powers clause in our fundamental law performs a similar function, serving as a principal justification for judicial restraint. *See* Ind. Const. art 3, § 1 (dividing the "powers of the Government . . . into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial"). And so, as with the other branches of government, our responsibility lies in preserving these boundaries.[4] "Good fences make good neighbors," after all. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 240 (1995).

At its core, then, the doctrine of standing asks: Where should the remedy lie? With the courts, or through the franchise? With judges, or with our politically-accountable elected officials? Not every case discusses these broad questions, but they're always present in the pondering.

Here, the Prosecutor's Office and the City both argue that our constitutional framers intended no private right to enforce article 8. Because the Common School Fund is "'held by the State,'" they insist, Prosecutor's Br. at 14 (quoting Ind. Const. art. 8, § 7), the State alone may

---

[4] Of course, our distribution-of-powers doctrine works both ways. This Court has not hesitated in finding infringement of the judicial power. *See, e.g.*, *State v. Monfort*, 723 N.E.2d 407, 412 (Ind. 2000) (holding that, while "the legislature has the power to create and abolish superior [and circuit] courts . . . within the limits of the Constitution," it may not "do so in the middle of a judge's term" without "violat[ing] the separation of powers provision of the Indiana Constitution"); *Thorpe v. King*, 248 Ind. 283, 287, 227 N.E.2d 169, 171 (1967) (holding that the legislature cannot set aside final judgment of a court); *Parkison v. Thompson*, 164 Ind. 609, 626, 73 N.E. 109, 115 (1905) (holding that the legislature cannot dictate "the manner and mode in which the courts shall discharge their judicial duties").

enforce article 8's constitutional obligations, *id.* at 14–21. Nineteenth-century precedent from this Court, they suggest, "confirmed" the framers' intent. *Id.* at 17.

Taxpayers reject this proposition, arguing instead that "[t]his Court has long held that Hoosiers may enforce **public** rights." Appellants' Reply Br. at 26 (emphasis added). When "public rather than private rights are at issue," they maintain, "it is enough that the plaintiff be a citizen, and as such interested in the execution of the laws." *Id.* (internal quotations omitted). And this right to public standing, they contend, encompasses the right to "vindicate Article 8." *Id.*

## A. From the mid-nineteenth century through today, our standing jurisprudence reveals a gradual shift toward judicial restraint.

On first impression, the early precedent on which the City and the Prosecutor's Office rely would seem to bolster their argument that the state alone may enforce article 8. *See State ex rel. Smith v. McLellan*, 138 Ind. 395, 398, 37 N.E. 799, 800 (1894) ("[T]he attorney general was the proper relator in a suit to recover moneys belonging to the common-school fund of the state."); *Bd. of Comm'rs of Tippecanoe Cty. v. State*, 92 Ind. 353, 358 (1883) (same). But on closer look, nothing in those cases precludes a

private party from enforcing article 8 on the state's behalf.[5] To the contrary, legislation enacted in the years immediately following constitutional ratification permitted "any person" to "maintain an action against" the township trustee, "in the name of the State of Indiana," to "recover for the use of the common school fund any sum not exceeding ten dollars." Act of Mar. 5, 1855, ch. 86, § 19, 1855 Ind. Acts 161, 165. *See also* Act of Mar. 8, 1873, ch. 25, § 4, 1873 Ind. Acts 75, 77 (providing that "the right of **any person** to bring suit in any court in any case arising under the school laws shall not be abridged") (emphasis added).

Consistent with this legislation, a long line of precedent from this Court recognizes taxpayer standing to ensure the proper administration of public funds, **including** revenues either vested in or intended for the Common School Fund. *See, e.g.*, *Harney v. Indianapolis, Crawfordsville, & Danville R.R. Co.*, 32 Ind. 244, 247 (1869) (recognizing taxpayer's "interest in the funds belonging to the county treasury as will enable him to maintain a suit to prevent unlawful appropriations thereof"); *Middleton v. Greeson*, 106 Ind. 18, 28–29, 5 N.E. 755, 761 (1886) (holding "that a tax-payer may enjoin" a township trustee from "contract[ing] for the building of a school-house, the cost of which would [have] largely exceed[ed] the amount of the special school fund"); *State ex rel. Colescott v. King*, 154 Ind. 621, 623, 627–28, 57 N.E. 535, 536, 538 (1900) (holding that a taxpayer is

---

[5] The Prosecutor's Office also relies on this Court's decision in *Pennsylvania Co. v. State*, 142 Ind. 428, 435–36, 41 N.E. 937, 940 (1895) (concluding that, even if the statutory allocation of civil fines to the prosecuting attorney were unconstitutional, as the railroad argued, "that would be a question properly arising between the state, for the benefit of the common school fund, and [the] prosecuting attorney"). But we question whether that case applies at all. While the statute at issue in *Pennsylvania Co.* referred to the $25 penalty as a "forfeiture," this Court, in a series of related cases, deemed it a **civil** fine, placing it beyond the reach of article 8, section 2. *See Toledo, St. L. & K.C.R. Co. v. Stevenson*, 131 Ind. 203, 204, 30 N.E. 1082, 1082 (1892) (rejecting appellant's argument that proceeds from a civil fine "should go to the common school fund alone" because article 8, section 2 "has reference to fines assessed in criminal prosecutions"); *State v. Indiana & I.S.R. Co.*, 133 Ind. 69, 79, 32 N.E. 817, 820 (1892) (concluding that, because article 8, section 2 "has reference to fines assessed in criminal prosecutions," the $25 civil penalty imposed on the railroad "is not a fine, in that sense"). *Pennsylvania Co.* expressly cites *I.S.R. Co.* as grounds for rejecting the railroad's argument. *See* 142 Ind. at 436, 41 N.E. at 939.

entitled to examine the county auditor's records to "ascertain or discover the true condition" of the public revenue); *State v. Blind*, 181 Ind. 689, 696, 105 N.E. 225, 227 (1914) (permitting taxpayer-plaintiffs to sue a township trustee for the diminution of the Common School Fund in violation of article 8, section 3); *Mitsch v. City of Hammond*, 234 Ind. 285, 289, 290, 125 N.E.2d 21, 23 (1955) (declaring that the "common school fund is a public fund of the state" in which "a taxpayer has such an interest" as to "enable him to maintain a suit . . . to prevent unlawful waste or appropriations thereof").

This legislation also codified the long-established principle that, when a private party seeks to vindicate a public right, "it is not necessary . . . that the relator should have a special interest in the matter." *Hamilton v. State ex rel. Bates*, 3 Ind. 452, 458 (1852). *See also Bd. of Comm'rs of Decatur Cty. v. State*, 86 Ind. 8, 12 (1882) (concluding that the "decided weight of authority is to the effect that where the question is one of public concern, and the object of the mandate is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result sought to be accomplished"). *See also* Louis L. Jaffe, *Standing to Secure Judicial Review: Public Actions*, 74 Harv. L. Rev. 1265, 1269–75 (1961) (discussing the English common-law origins of the public action).

Historically, then, our courts have been sympathetic toward standing, permitting private plaintiffs to vindicate a variety of claims, whether to enforce a public duty or to challenge the expenditure of public funds. Indeed, our historical precedent is replete with suits in which private parties, as relators, sought to compel the "levy [of] a railroad tax," the "repair [of] a bridge," "due diligence in keeping the highways . . . in good repair," and the meeting of public officials for "the purpose of electing a county superintendent of schools." *State ex rel. Sigler v. Bd. of Comm'rs of Madison Cty.*, 92 Ind. 133, 134 (1883); *State ex rel. Winterburg v. Demaree*, 80 Ind. 519, 520 (1881); *State ex rel. Cutter v. Kamman*, 151 Ind. 407, 408, 51

N.E. 483, 484 (1898); *Wampler v. State ex rel. Alexander*, 148 Ind. 557, 558, 47 N.E. 1068, 1068 (1897).[6]

But is there a point at which judicial accommodation of these claims threatens to upset the delicate balance of government powers that our constitution embodies? Aren't questions of tax policy, infrastructure repair, and local elections better suited for the legislative and executive branches of government?

By the mid-twentieth century, this Court—tracking jurisprudential developments at the federal level—had signaled a more cautious approach to standing, finding it insufficient for a plaintiff to possess "merely a general interest common to all members of the public." *Terre Haute Gas Corp. v. Johnson*, 221 Ind. 499, 505, 45 N.E.2d 484, 486 (1942) (citing *Ex parte Levitt*, 302 U.S. 633 (1937)). Rather, "[f]or the disposition of cases and controversies," this Court regularly required "adverse parties before it." *City of Indianapolis v. Indiana State Bd. of Tax Comm'rs*, 261 Ind. 635, 638, 308 N.E.2d 868, 870 (1974). And standing, as a threshold matter in deciding a claim, also demanded these parties to "show injury." *Bd. of Comm'rs of Howard Cty. v. Kokomo City Plan Comm'n*, 263 Ind. 282, 286, 330 N.E.2d 92, 96 (1975).

Emblematic of this paradigm shift is *Pence v. State*, 652 N.E.2d 486 (Ind. 1995), in which the plaintiff challenged as unconstitutional a legislative pay raise attached to an unrelated bill which the governor had signed into law.[7] *See* Ind. Const. art. 4, § 19 (confining legislation "to one subject and matters properly connected therewith"); *id.* § 29 (prohibiting an increase in compensation for legislators "during the session in which [an] increase may be made"). The suit aimed a judicial harpoon straight at the heart of the legislative prerogative, attacking the practice of "logrolling," a process

---

[6] While some states may not have recognized public standing, there was "a decided preponderance of American authority in favor of the doctrine, that private persons may move for a mandamus to enforce a public duty." *Union Pacific R.R. Co. v. Hall*, 91 U.S. (1 Otto) 343, 355 (1875).

[7] The named appellant, with and on behalf of the Indiana Policy Review Foundation, is now Vice President of the United States.

common to lawmaking that often requires back-scratching compromise, deal making, and coalition building. But in shielding "our state constitutional scheme of separation of powers," a majority of this Court prudently held that, with no "interest beyond that of the general public," the plaintiff lacked standing. *Pence*, 652 N.E.2d at 488 (citing Ind. Const. art. 3, § 1). "While the availability of taxpayer or citizen standing may not be foreclosed in **extreme circumstances**," the majority concluded, "it is clear that such status will rarely be sufficient." *Id.* (emphasis added).

The opinion drew the dissent of Justice Dickson, who would have conferred standing on the plaintiff on two grounds: first, "as an Indiana taxpayer to challenge the constitutionality of the expenditure of public funds," and second, "under Indiana's public standing doctrine." *Id.* at 489. "Where public rather than private rights are at issue," he opined, "the usual requirements for establishing standing need not be met." *Id.*

Justice Dickson's view in *Pence* gained further traction eight years later in *State ex rel. Cittadine v. Indiana Department of Transportation*, 790 N.E.2d 978 (Ind. 2003). The plaintiff in that case, as a "member of the motoring public," petitioned for a writ of mandamus, seeking to compel INDOT to enforce a statute regulating railroad crossings. *Id.* at 984. The trial court denied the writ and the Court of Appeals affirmed on grounds that the plaintiff lacked standing. Despite this Court disposing of the case's merits on mootness grounds after the legislature amended the pertinent statute, *id.*, Justice Dickson wrote at length to "acknowledge the availability of the public standing doctrine in Indiana courts," *id.* at 979. "[W]hen a case involves enforcement of a public rather than a private right," he opined, echoing his dissent in *Pence*, the plaintiff "need not have a special interest in the matter nor be a public official." *Id.* at 980 (internal quotation marks omitted).

Despite the plaintiff's complete lack of a "specific injury," the *Cittadine* opinion recites the general rule that standing requires a showing of harm and "a personal stake in the outcome of the litigation." *Id.* at 980, 979. Application of this rule by the majority in *Pence*, the Court reasoned, was "merely to express our exercise of judicial discretion with cautious restraint under the circumstances." *Id.* at 983. The recognition in *Pence* that

public standing is limited to "extreme circumstances," the Court concluded, clearly "acknowledges the . . . doctrine."[8] *Id.*

Just four months after the decision in *Cittadine*, this Court again confronted the question of standing, this time in a constitutional claim under the Indiana Bill of Rights. In *Embry v. O'Bannon*, taxpayer-plaintiffs challenged the constitutionality of the state's "dual enrollment" statute, a measure allocating additional funds to parochial-school students enrolled in public-school courses. 798 N.E.2d 157, 158 (Ind. 2003), *modified on other grounds by Meredith v. Pence*, 984 N.E.2d 1213 (Ind. 2013); *see* Ind. Const. art. 1, § 6 (prohibiting the expenditure of public funds "for the benefit of any religious or theological institution"). Relying on *Pence*, both the trial court and the Court of Appeals determined that the taxpayers lacked standing. 798 N.E.2d at 161. This Court, however, conferred standing while nevertheless upholding the statute as constitutional. *Id.* at 167. Because of their "shared public interest as taxpayers in the allegedly unconstitutional expenditure of public funds," Justice Dickson reasoned, joined by Justice Rucker, the plaintiffs fell "within the public standing exception to the general standing requirement." *Id.* at 160.

Justice Sullivan, joined by Chief Justice Shepard, wrote a separate concurring opinion to "give more detailed attention" to standing. *Id.* at 167. Drawing on principles of Article III jurisprudence, the opinion explains that, because the constitution imposes "'no absolute bar'" to taxpayer standing, those with a "concrete interest" in the expenditure of public funds may challenge a government action as exceeding its constitutional powers. *Id.* at 168–69 (quoting *Flast v. Cohen*, 392 U.S. 83, 88

---

[8] Although the majority in *Pence* spoke nothing of the public-standing doctrine, the *Cittadine* Court—while recognizing this silence—cursorily concluded that the language in *Pence* "clearly does not abrogate but rather acknowledges the . . . doctrine." *See State ex rel. Cittadine v. Indiana Dep't of Transp.*, 790 N.E.2d 978, 983 (Ind. 2003).

(1968)).[9] In other words, taxpayer status alone cannot confer standing. Instead, the parties must have "'a personal stake in the outcome of the controversy.'" *Id.* at 168 (quoting *Flast*, 392 U.S. at 99).[10] Because these plaintiffs properly raised an express constitutional limitation on the expenditure of public funds, Justice Sullivan concluded that the case presented the requisite "extreme circumstances" to establish taxpayer standing. *Id.*

So where does this leave us? How do we reconcile these ostensibly competing theories of standing?[11]

## B. Taxpayer standing and public standing are distinct doctrines.

In his dissent in *Pence*, Justice Dickson would have conferred standing on the plaintiff both "as an Indiana taxpayer to challenge the constitutionality of the expenditure of public funds" and "under Indiana's public standing doctrine." 652 N.E.2d at 489. The Court in *Cittadine*, however, conflated these distinct grounds, creating a single public-standing doctrine which effectively exempts a plaintiff from showing **any** articulable harm, whether in raising a constitutional challenge or petitioning to enforce a statute, regulation, or other public law. 790 N.E.2d

---

[9] *Flast v. Cohen* created a narrow exception to the general rule of standing that permits taxpayers to challenge the expenditure of federal funds in religious schools under the express limitations of the First Amendment Establishment Clause. 392 U.S. 83, 103 (1968).

[10] Subsequent federal cases, vigilant in enforcing the separation of powers, have largely declined to extend *Flast* beyond its facts. *See, e.g.*, *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464 (1982); *Freedom From Religion Found., Inc. v. Nicholson*, 536 F.3d 730 (7th Cir. 2008).

[11] Even if we were to characterize our discussion and critique of the pertinent case law here as mere "dicta," *post,* at 1, 5 (concurrence in result), that "characterization does not give to this court license to ignore the clear import of the language" in its "interpretation of the law in this area," *Stevens v. Norfolk W. Ry. Co.*, 171 Ind. App. 334, 340, 357 N.E.2d 1, 4 (1976). *See also Fesler v. Brayton*, 145 Ind. 71, 83, 44 N.E. 37, 40 (1896) (stating that opinions made in prior cases, although not essential to their holdings, "are no mere obiter dicta" since "they express the kernel of the principle" applied).

at 983 (declaring that the "public standing doctrine permits the assertion of **all proper legal challenges**, including claims that government action is unconstitutional") (emphasis added). This doctrinal obfuscation has led to some confusion among our courts on the precise contours of standing. *See, e.g.*, *Liberty Landowners Ass'n, Inc. v. Porter Cty. Comm'rs*, 913 N.E.2d 1245, 1251 (Ind. Ct. App. 2009) (observing, in a challenge to a zoning ordinance, that "the public standing doctrine or the availability of taxpayer or citizen standing is limited to extreme circumstances"), *trans. denied*; *Meredith v. Pence*, 984 N.E.2d 1213, 1217 n.4 (Ind. 2013) ("As taxpayers challenging allegedly unconstitutional use of public funds, the plaintiffs have standing under Indiana's public standing doctrine, an exception to the general requirement that a plaintiff must have an interest in the outcome of the litigation different from that of the general public.") (internal quotations omitted).

While both doctrines overlap to some extent, unique rationales distinguish them. Taxpayer standing generally implicates a challenge to some government action that involves the expenditure or appropriation of public funds. *See* Joshua G. Urquhart, *Disfavored Constitution, Passive Virtues? Linking State Constitutional Fiscal Limitations and Permissive Taxpayer Standing Doctrines*, 81 Fordham L. Rev. 1263, 1278 (2012) (citing *Cittadine* for the proposition that Indiana "permit[s] 'public importance' or 'public interest' lawsuits, effectively in lieu of traditional taxpayer actions"). Public standing, on the other hand, involves a challenge to "virtually any government action," so long as there's a "substantial public interest, as determined by the court overseeing the lawsuit." *Id.* at 1279. Whereas the former doctrine has at least some "connection to an injury-in-fact, however tenuous it may be," the latter doctrine typically "has no

basis in, and cannot be traced to, a particularized injury-in-fact."[12] M. Ryan Harmanis, Note, *States' Stances on Public Interest Standing*, 76 Ohio St. L.J. 729, 750 n.134 (2015). *See also* Jaffe, *Standing to Secure Judicial Review*, 74 Harv. L. Rev. at 1280 ("The point of the distinction . . . is that the plaintiff in the taxpayer's suit is thought to be 'affected' in a sense that distinguishes him from the citizen who in mandamus is the mere instrument of the public's concern.").

Public standing, then, as the *Cittadine* Court articulated, risks pushing the judiciary's role beyond the boundaries contemplated by our distribution-of-powers doctrine. *See* Harmanis, *States' Stances on Public Interest Standing*, 76 Ohio St. L.J. at 750 n.134 (concluding that "public interest standing functionally equates to the judiciary unilaterally expanding its own authority"). By permitting **any** person, **without** a showing of harm, to enforce a public right or duty, what limits are there? If all government action is subject to judicial review, what purpose does the political process serve?[13] What role does the franchise play? What incentive is left for our citizens to exercise their constitutional right of "applying to the General Assembly for redress of grievances"? *See* Ind. Const. art. 1, § 31.

---

[12] The characterization of taxpayer standing as a "category" of public standing, *see post,* at 3, 4 (concurrence in result), overlooks the two distinct doctrinal grounds on which Justice Dickson would have conferred standing to the plaintiff in *Pence, see* 652 N.E.2d at 489. And the conflation of these two doctrines, we believe, leads to the improper conclusion that a **majority** in *Embry* applied the public-standing doctrine. *See* 798 N.E.2d at 167–69 (Sullivan, J., concurring) (writing to clarify that plaintiffs had **taxpayer** standing to bring their claim). *See also* Frank Sullivan, Jr., *A Look Back: Developing Indiana Law, Post-Bench Reflections of an Indiana Supreme Court Justice*, 47 Ind. L. Rev. 1217, 1230 n.94 (2014) (questioning whether there were three votes for the proposition that taxpayer standing and public standing are one in the same, with "Justice Boehm's vote being opaque on that point").

[13] On this point, the irony of *Cittadine* is palpable: The legislative amendment that preceded the Court's decision not only rendered the case moot, but also illustrates the malleability of state statutory law, which offers citizens a "clear avenue to make changes that public interest standing would instead leave to the judiciary." M. Ryan Harmanis, Note, *States' Stances on Public Interest Standing*, 76 Ohio St. L.J. 729, 743 (2015).

We need not answer these questions today because Taxpayers' claim involves an express constitutional limitation on the appropriation of public funds. And in resolving their claim, we give no precedential weight to *Cittadine* on the question of standing.[14] *See Embry*, 798 N.E.2d at 167 (Sullivan, J., concurring) ("*Cittadine* was not a constitutional case."). *See also* Frank Sullivan, Jr., *A Look Back: Developing Indiana Law, Post-Bench Reflections of an Indiana Supreme Court Justice*, 47 Ind. L. Rev. 1217, 1230 (2014) (observing that the plaintiff in *Cittadine* was not held to have standing "by virtue of being a taxpayer"). Instead, we rely on the concurring opinion in *Embry* for guidance. That opinion, we believe, offers a fair standard for taxpayer-plaintiffs seeking to litigate a constitutional claim. Indeed, by emphasizing the need to show "'extreme circumstances,'" 798 N.E.2d at 168 (quoting *Pence*, 652 N.E.2d at 488), the standard preserves the taxpayer-standing doctrine while respecting the balance of powers expressly called for in our state's fundamental law.

By adopting the standard articulated in Justice Sullivan's *Embry* concurrence, we hold that, to establish taxpayer standing, a plaintiff must (1) raise a challenge seeking to vindicate an express constitutional

---

[14] We disagree that our opinion serves to "eliminate" the public-standing doctrine. *See post*, at 2 (concurrence in result). But we decline to consecrate that doctrine simply because it's a "long-standing feature of Indiana law." *See ibid.* Such an approach endorses a static view of our standing jurisprudence, ignoring the shift in doctrinal philosophy over time. *Compare, e.g., Hamilton v. State ex rel. Bates*, 3 Ind. 452, 458 (1852) (concluding simply that, when a private party by writ of mandamus seeks to vindicate a public right, "it is not necessary . . . that the relator should have a special interest in the matter"), *with Wampler v. State ex rel. Alexander*, 148 Ind. 557, 564, 47 N.E. 1068, 1070 (1897) (characterizing mandamus "as an extraordinary remedy" which applies "**only where the law affords no other adequate remedy**") (emphasis added), *and State ex rel. Goldsmith v. Superior Court of Marion Cty., Criminal Div., Room No. Four*, 463 N.E.2d 273, 275 (Ind. 1984) ("The writ of mandamus is an extraordinary remedy, viewed with **extreme disfavor**. As a general rule, the relator must have a clear and unquestioned right to relief before mandamus may be invoked and the respondent must have failed to perform a clear, absolute, and imperative duty imposed by law.") (emphasis added) (internal citations and quotation marks omitted).

limitation on the expenditure of public funds,[15] (2) demonstrate some personal stake in the outcome of the controversy, and (3) show "extreme circumstances" warranting judicial intervention.[16]

## C. Taxpayers have standing to litigate their claim under our taxpayer-standing doctrine.

In applying our standard here, we conclude that Taxpayers have standing to litigate their claim. First, their claim clearly implicates an express constitutional limitation on the expenditure or appropriation of public funds. *See* Ind. Const. art. 8, § 3 (prohibiting the principal of the Common School Fund from being "diminished"). And because this Fund is a "public fund of the state" in which all taxpayers have an interest in preventing its "unlawful waste" or misappropriation, Taxpayers meet the second prong of our standard. *See Mitsch*, 234 Ind. at 290, 289, 125 N.E.2d at 23. Finally, because Taxpayers challenge the Civil Forfeiture Statute as an abuse of the legislative prerogative, and because the Prosecutor's Office agrees that this case "raise[s] a substantial question of Indiana constitutional law," Prosecutor's Resp. Mot. Trans. at 2, Taxpayers successfully present the "extreme circumstances" necessary to establish standing. *See Pence*, 652 N.E.2d at 488; *Embry*, 798 N.E.2d at 168 (Sullivan, J., concurring). In so concluding, this "Court does not overstep [its]

---

[15] Recent decisions from this Court on broader questions of justiciability bolster this narrow exception to the general rule of standing. *See, e.g.*, *Berry v. Crawford*, 990 N.E.2d 410, 413 (Ind. 2013) (holding that, when "the Indiana Constitution expressly assigns certain functions to the legislative branch **without any contrary constitutional qualification** or limitation, challenges to the exercise of such legislative powers are nonjusticiable and the doctrine of separation of powers precludes judicial consideration of the claims for relief") (emphasis added); *id.* at 422 (Rush, J., concurring in part and dissenting in part) ("[L]egislative actions are non-justiciable if they are taken 'pursuant to specific constitutional authority and **not contrary thereto**.'") (quoting *Roeschlein v. Thomas*, 258 Ind. 16, 28, 280 N.E.2d 581, 589 (1972)) (emphasis added in *Berry*).

[16] Our holding today does not "[drive] a knife into . . . precedent" and this Court's "integrity." *See post*, at 5 (concurrence in result). Instead, it identifies a rule of standing more consistent with the first principles discussed in the opinion concurring in the judgment, taking a scalpel to more than a century and a half of sometimes-conflicting precedent while still affording standing in this extreme circumstance.

limitations in deciding this challenge." *Embry*, 798 N.E.2d at 169 (Sullivan, J., concurring).

We also emphasize that, had Taxpayers brought their claim as a private party—whether in defending against civil or criminal liability or in seeking damages—this Court would have properly denied them standing. *See Hoagland v. Franklin Twp. Cmty. Sch. Corp.*, 27 N.E.3d 737, 741 (Ind. 2015) (holding that article 8, section 1 of the Indiana Constitution, "does not provide an individual with a private right of action for monetary damages"); *$100 and a Black Cadillac v. State*, 822 N.E.2d 1001, 1015 (Ind. Ct. App. 2005) (concluding that a party, in defending against a forfeiture action after pleading guilty to dealing in drugs, did "not have standing to question" whether the Civil Forfeiture Statute violated article 8, section 2), *trans. denied*; *Michener*, 120 Ind. 282, 283, 22 N.E. 255, 255 (1889) (observing that "individual citizens have no private interest" in public funds).

## II. Article 8, section 2 applies to civil forfeitures.

Turning to the merits, we must first determine whether article 8, section 2 applies to civil forfeitures. Civil forfeiture "is a device, a legal fiction, authorizing legal action against inanimate objects for participation in alleged criminal activity, regardless of whether the property owner is proven guilty of a crime—or even charged with a crime." *Serrano v. State*, 946 N.E.2d 1139, 1140 (Ind. 2011). In dismissing this case, the trial court reasoned that civil forfeitures "were unknown in 1851 when Article 8, Section 2, was added to the Indiana Constitution." Appellant's App. Vol. II, p.172. But a cursory look at the historical record shows otherwise.

"Since the earliest years of this Nation, Congress has authorized the Government to seek parallel *in rem* civil forfeiture actions and criminal prosecutions based upon the same underlying events." *United States v. Ursery*, 518 U.S. 267, 274 (1996) (citing a federal statute from 1789). Maritime law propelled this practice during the early national period. A federal statute in 1819, for example, authorized officials to "seize" any "armed vessel or boat" for committing "piratical aggression." Act of Mar. 3, 1819, ch. 77, § 2, 3 Stat. 510, 512–13. A court would then "order a sale" of the vessel, after certain proceedings, and distribute the proceeds. *Id.* § 4, 3

Stat. at 513. And "no personal conviction of the offender [wa]s necessary to enforce" those proceedings. *The Palmyra*, 25 U.S. (12 Wheat.) 1, 15 (1827), *superseded by statute as stated in Honeycutt v. United States*, 137 S. Ct. 1626, 1634 (2017). To the contrary, any "proceeding *in rem* stands independent of, and wholly unaffected by any criminal proceeding *in personam*." 25 U.S. (12 Wheat.) at 1.

In 1844, just seven years before the ratification of our 1851 Constitution, the U.S. Supreme Court reaffirmed federal authority to seize a vessel despite no underlying crime by its owner. *The Malek Adhel*, 43 U.S. (2 How.) 210, 233 (1844). "The vessel which commits the aggression is treated as the offender," the Court emphasized, "as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner." *Id.*

Dictionaries and legal treatises contemporary to the 1850–51 debates offer a similar characterization of civil forfeitures. According to one dictionary available to the framers, a forfeiture involved any property "alienated by a crime, offense, neglect of duty, or breach of contract." Noah Webster, *An American Dictionary of the English Language* 354 (1841), *available at* https://hdl.handle.net/2027/hvd.hnezz9.[17] Consistent with this definition, this Court held over a century ago that a "forfeiture may be generally defined to be the loss of what belongs to a person in consequence of some fault, misconduct or transgression of law." *State ex rel. Baldwin v. Bd. of Comm'rs of Marion Cty.*, 85 Ind. 489, 493 (1882). This loss of property, however, didn't depend on any underlying guilt of a property owner. As nineteenth-century legal scholar Joel Prentiss Bishop noted in his seminal treatise on criminal law, officials could seize property "without regard to whether the owner commits, at the same time, a crime or not." *Commentaries on The Criminal Law*, § 698 (1856). As with modern

---

[17] Convention delegates periodically consulted the "larger edition of Webster's English Dictionary." *See* 2 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 1384 (1851). *See also id.* at 1432 ("[I]f he will take the trouble to look into Webster's dictionary . . . .").

practice, property could be forfeited through civil proceedings, with the property "itself directly" held liable for any wrongful conduct. *Id.* § 703.

From this brief historical inquiry, we have little doubt that our constitutional framers understood that "a conviction on the underlying criminal activity is not a prerequisite for forfeiture." *Katner v. State*, 655 N.E.2d 345, 348 (Ind. 1995). And because "Indiana's system for civil forfeitures proceeds under" article 8, *Serrano*, 946 N.E.2d at 1141, we hold that the Civil Forfeiture Statute falls within the scope of article 8, section 2.

## III. Article 8, section 2 permits the legislature to determine how and when forfeiture proceeds accrue to the Common School Fund.

Indiana's Civil Forfeiture Statute directs the transfer of proceeds from seized property "to the treasurer of state for deposit in the common school fund." I.C. § 34-24-1-4(d). But before these proceeds accrue to the Fund, the Statute permits the allocation of forfeiture revenue to reimburse law enforcement costs. *Id.* Taxpayers argue that "the Civil Forfeiture Statute violates Article 8 of the Indiana Constitution by diverting forfeiture revenue from the common school fund." Appellants' Br. at 17.

To determine the constitutionality of the Civil Forfeiture Statute, we must examine "the language of the **text** in the context of the **history** surrounding its drafting and ratification" as well as "the **purpose and structure** of our constitution." *City of Hammond*, 119 N.E.3d at 79 (emphases added) (internal quotations omitted).

### A. Text of article 8.

First, we turn to article 8's text. Article 8, section 2 dictates that, among other things, the Common School Fund "shall consist of . . . [t]he fund to

be derived from . . . all forfeitures which may accrue."[18] Ind. Const. art. 8, § 2. According to Taxpayers, this "case begins and ends with a straightforward application" of this text. Appellants' Br. at 17. "The framers' intent could not be clearer," Taxpayers insist: "All forfeitures—not some forfeitures or ten percent of forfeitures—belong to the school fund." *Id.* at 27 (internal quotation marks omitted). And, according to Taxpayers, the Civil Forfeiture Statute violates article 8 because section 3 commands that the principal of this Fund "shall never be diminished" and

---

[18] Under article 8, section 2, our framers consolidated several existing sources of revenue into a "Common School fund." *See* Richard Gause Boone, *A History of Education in Indiana* 212 (1892). Article 8, section 2, in its entirety, reads as follows:

> The Common School fund shall consist of the Congressional Township fund, and the lands belonging thereto;
>
> The Surplus Revenue fund;
>
> The Saline fund and the lands belonging thereto;
>
> The Bank Tax fund, and the fund arising from the one hundred and fourteenth section of the charter of the State Bank of Indiana;
>
> The fund to be derived from the sale of County Seminaries, and the moneys and property heretofore held for such Seminaries; from the fines assessed for breaches of the penal laws of the State; and from all forfeitures which may accrue;
>
> All lands and other estate which shall escheat to the State, for want of heirs or kindred entitled to the inheritance;
>
> All lands that have been, or may hereafter be, granted to the State, where no special purpose is expressed in the grant, and the proceeds of the sales thereof; including the proceeds of the sales of the Swamp Lands, granted to the State of Indiana by the act of Congress of the twenty eighth of September, eighteen hundred and fifty, after deducting the expense of selecting and draining the same;
>
> Taxes on the property of corporations, that may be assessed by the General Assembly for common school purposes.

Although article 8, section 2 dictates that proceeds from forfeitures accrue to a fund that is a **component** part of the Common School Fund, we find that to be a logistical step irrelevant to our analysis and will refer to forfeiture proceeds as accruing directly to the Common School Fund.

must only be "appropriated to the support of Common Schools, and to no other purpose whatever." *Id.* (internal quotation marks omitted).

As this Court observed nearly a century and a half ago, article 8 is "certainly not self-acting in [its] operation." *State ex rel. Att'y Gen. v. Meyer*, 63 Ind. 33, 40 (1878). Thus, "[l]egislation was requisite and necessary to carry [its] provisions into practical effect, and especially to create the 'common school fund.'" *Id.*[19] Indeed, in his December 1851 address to the General Assembly, Governor Joseph A. Wright impressed upon the legislature that it was their "duty to husband this fund . . . to provide for the education of the youth of every county, township, and district." Indiana House Journal at 20 (Dec. 2, 1852). Heeding this call, the members of the Thirty-Sixth General Assembly crafted the 1852 Free School Law to, among other things, enliven "the provisions of the Constitution concerning the school funds" and provide "for their safe investment." Richard Gause Boone, *A History of Education in Indiana* 144 (1892) (*History of Education*).

Nearly a century later, our Court of Appeals reaffirmed the legislature's prerogative to determine when and how money accrues to the Common School Fund. In *State v. Elliott*, the state treasurer challenged a statute requiring a county auditor to keep "a record of all fines, forfeitures and other revenue which accrues to the Common School fund," with the auditor only paying to the state treasurer those amounts biannually. 171 Ind. App. 389, 392, 357 N.E.2d 276, 278 (1976). This scheme, the treasurer argued, allowed the auditor to impermissibly divert money away from the Fund. *Id.* at 393, 357 N.E.2d at 279. But in upholding the statute, the Court of Appeals determined that a forfeiture "accrue[s] to the Common School fund" upon "possession of the Treasurer of State." *Id.* Until then, the "property rights of the State in the [Fund] have not vested." *Id.* at 392, 357 N.E.2d at 278.

---

[19] While, of course, "[a] constitutional provision that is 'not self acting' can still limit governmental action," *post*, at 5 (dissent), the text of section 2 refers only to those forfeitures that "**may** accrue" to the Fund.

As further proof that the framers contemplated this legislative power, statutes permitting cost offset for forfeiture were in place as they assembled to craft our new constitution. For example, from 1836 to 1847, as the General Assembly incorporated various cities and towns across the state, legislation consistently permitted the payment of "[a]ll **expenses incurred** in prosecuting for the recovery of any penalty or forfeiture." Act of Feb. 8, 1836, ch. 3, § 34, 1835 Ind. Acts 8, 16 (emphasis added).[20] And despite the 1816 Constitution requiring that "**[a]ll** fines, penalties and forfeitures . . . inure to the use of the State or County," Ind. Const. of 1816, art. XII, § 2 (emphasis added), only those proceeds remaining after this offset were "paid to the treasurer for the use of said city," Act of Feb. 8, 1836, ch. 3, sec. 34, 1835 Ind. at 16. This section of the 1816 Constitution, as with its modern counterpart, contained no express language permitting the offsetting of costs. But, like the statute at issue in *Elliott*, these incorporation statutes—effective at the time of the 1850–51 Constitutional Convention—exhibit the framers' understanding that, even without express language permitting offset, the legislature can direct when and how forfeiture proceeds "accrue" or "inure" to the state. Indeed, this view tracks historical descriptions of certain revenue sources under section 2—forfeitures, criminal fines, and escheated estates—as "incidental," or, "contingent." Ind. Dep't of Public Instruction, *First Annual Report* 45 (1852); Ind. Dep't of Public Instruction, *Twentieth (Sixth Biennial) Report of the Superintendent of Public Instruction for the State of Indiana* 17 (1872).

So, under article 8's text, the General Assembly can determine how and when a forfeiture accrues to the Common School Fund.

---

[20] This particular act applied to the incorporation of Michigan City. Acts incorporating other towns and cities contained the same or similar language. *See* Act of Feb. 17, 1838, ch. 5, § 52, 1837 Ind. Acts 34, 44 (Terre-Haute); Act of Jan. 28, 1839, ch. 8, § 51, 1838 Ind. Acts 18, 28 (Jeffersonville); Act of Feb. 22, 1840, ch. 5, § 31, 1839 Ind. Acts 16, 26 (Fort Wayne); Act of Feb. 24, 1840, ch. 6, § 47, 1839 Ind. Acts 31, 41 (Richmond); Act of Feb. 15, 1841, ch. 120, § 22, 1840 Ind. Acts 171, 176 (Connersville); Act of Feb. 16, 1848, ch. 286, § 22, 1847 Ind. Acts 378, 383 (New Columbus).

## B. History surrounding article 8.

The history surrounding article 8 bolsters our plain reading of the text. In constitutional historical inquiries, we "examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy." *Bayh v. Sonnenburg*, 573 N.E.2d 398, 412 (Ind. 1991) (quotation marks omitted).

Here, we agree with Taxpayers that our constitutional framers, in drafting article 8, sought to deter the dual mischiefs of malfeasance and financial incompetence that had become so pervasive among state and local officials administering school funds. Indeed, as Taxpayers maintain, the history of article 8 confirms that our constitutional framers "created a dedicated school fund to stop government actors from siphoning money from educational objectives." Appellants' Br. at 32. But Taxpayers' view of the history surrounding article 8 omits important context.

Following the passage of Indiana's first comprehensive school law in 1824, "school revenue was inconsiderable" due to the "mismanagement of funds." *History of Education* at 26. Compounded by "local indifference and sometimes legislative evasion," the school law "was doomed to failure for lack of funds." *Id.* at 27. And despite "very elaborate" reform in 1833, "progress was discouragingly slow." *Id.* at 32, 34. Even as Hoosiers approached mid-century, further attempts to safeguard school funding proved "far from satisfactory." *Id.* at 38–39. In his address to the House of Representatives at the Twenty-Eighth Indiana General Assembly, Governor Samuel Bigger lamented that "our school funds were not producing the fruits which we had a right to expect, but were in danger in many cases of being irretrievably lost." Indiana House Journal at 18 (Dec. 5, 1843). According to the governor, accountability measures were necessary to ensure "the various education funds will be rendered much more secure and productive." *Id.*

And this concern carried over into the debates over our 1851 constitution. Delegate John I. Morrison, chairman of the committee on education, reported to the convention that, "[i]n the present state of affairs, we have no means of ascertaining accurately, the true conditions" of the state's school fund. 2 *Report of the Debates and Proceedings of the*

*Convention for the Revision of the Constitution of the State of Indiana* 1860 (1851). According to Delegate Morrison, "abundant evidence" showed "the danger to which the several educational funds are exposed," with thousands of dollars "lost beyond recovery." *Id.*

Still, despite the frustration shown by leaders during this period, we find no evidence of any steadfast commitment by the framers against the offsetting of proceeds collected from forfeitures or other contingent sources of revenue under section 2. To the contrary, the pre-accrual allocation of proceeds from these sources acted as a financial incentive to **stimulate** the Fund's growth.

Just two years after the framers completed their work, William C. Larrabee, Indiana's first State Superintendent of Public Instruction, cited allegations in his second annual report to the General Assembly that public officers responsible for imposing "fines for breaches of the penal laws of the State" had "fail[ed] to issue process for the collection of such fines," thus depriving the Fund of significant resources.[21] Ind. Dep't of Public Instruction, *Second Annual Report of the Superintendent of Public Instruction for the State of Indiana* 18 (1853).

Little had changed in the years that followed. In his 1865 report to the General Assembly, Superintendent Samuel L. Rugg speculated that, of the fines and forfeitures collected, there had "probably been but little added" to the Fund. Ind. Dep't of Public Instruction, *Thirteenth (Second Biennial) Report of the Superintendent of Public Instruction for the State of Indiana* 17 (1865). The reason for this, he suggests, was the lack of a "statute in force requiring officers to pay over or add to the school fund, the money collected upon forfeited recognizances, or upon any other kind of forfeitures." *Id.* at 17–18. Additional forfeiture proceeds, he concluded,

---

[21] As one respected historian describes them, these "reports of the state superintendent to the legislature constitute the most complete record available of the state educational system and contain recommendations for improving the system which had some influence with the lawmakers." Emma Lou Thornbrough, *Indiana in the Civil War Era, 1850-1880*, at 466 (1965).

would be unlikely, "unless there is some provision of law giving it that direction." *Id.* at 18.

By 1872, the pressing need to incentivize the collection of fines, forfeitures, and other contingent revenue sources had become a priority. That year, Superintendent Milton Hopkins pled with the General Assembly for some "means of increasing" the Common School Fund. Ind. Dep't of Public Instruction, *Twentieth (Sixth Biennial) Report of the Superintendent of Public Instruction for the State of Indiana* 33 (1872). "There is a wide spread belief . . . among school officers and many others," he wrote, "that the fines, forfeitures and unclaimed witness fees, that are the parts of both fund and revenue are not faithfully reported." *Id.* To Hopkins, the dismal revenue stream at the time suggested that "justice [was] not so faithfully administered." *Id.*

In a circular issued that same year, Attorney General Bayless Hanna reminded the county commissioners "that all fines assessed for breeches of the penal laws of the State, together with all forfeiture which may accrue, and all unclaimed fees, constitute a part of the Common School fund." *Id.* at 34. Income from these sources, he concluded, should "have resulted in vast revenues for the use of the State and the counties." *Id.* But an accounting by the state auditor revealed that "a vast sum of money" had either "not been . . . collected according to law" or had "been appropriated to personal gain." *Id.* To correct this "malfeasance," he urged the county commissioners to "employ a competent Attorney, at reasonable compensation," to determine the extent to which "fines, forfeitures and unclaimed fees . . . belonging to the School Fund" had "not been accounted for." *Id.* at 34–35.

The General Assembly responded to these pleas at its following legislative session in 1873. At the behest of Governor Conrad Baker, lawmakers adopted a measure requiring "the Clerks of the several Circuit Courts" to, among other things, "forward to the Attorney General," at the close of each term, "a statement of all fines assessed and forfeitures entered during such term." Act of Mar. 10, 1873, ch. 7, § 4, 1873 Ind. Acts 18, 19; 14 Brevier Legis. Rep. App., pp. 6–7 (1873) (message of Governor Baker to the General Assembly). The Act also required the attorney

general to "ascertain from time to time the amounts paid to any public officer" for, among other revenue sources, "money unclaimed in estates or guardianships, fines or forfeitures, or moneys that escheat to the State for want of heirs." Act of Mar. 10, 1873, ch. 7, § 9, 1873 Ind. Acts at 20. Should any public officer "fail, neglect or refuse" to collect those revenue proceeds, the Act authorized the attorney general to prosecute "all necessary proceedings to compel the[ir] payment . . . or recovery." *Id.* And to enable the attorney general "to ascertain the facts," the Act required a full accounting from every public officer with "custody of any such moneys." *Id.* To measure progress, "annual reports to the Secretary of State" were to include statistics on "[a]ll fines assessed and forfeitures entered in the State." *Id.* § 10, 1873 Ind. Acts at 20.

As an incentive to prosecute these actions, the Act allocated to the attorney general, for "all collections made or property recovered," a "commission of twenty per cent. on the first thousand dollars, ten per cent. on sums not exceeding two thousand dollars, and on all sums exceeding two thousand dollars five per cent."[22] *Id.* And to "aid him in the discharge of his duties," the Act permitted the attorney general to employ assistants and to "pay to them **out of the sums so collected**" a commission "not exceeding ten per cent." *Id.* § 11, 1873 Ind. Acts at 20 (emphasis added). While the Act was expected to result in a "considerable increase in the salary of the Attorney General," Governor Baker reasoned that such expense "would be compensated fifty-fold by the increase of the school

---

[22] This compensation scheme—from nearly a century and a half ago—shows that percentage-based allocations are nothing new, in contrast to the assertion that history reveals offset costs must "demonstrate a tie to expenses incurred in obtaining each forfeiture." *Post*, at 6 (dissent). To be sure, "[t]his Court has never held that a civil-forfeiture statute is constitutional even though the allocations bear no correlation to expenses incurred in obtaining the forfeiture." *Ibid.* But we have also never held the opposite. Indeed, we have "never decided the constitutionality of" any civil forfeiture scheme. *Post*, at 6 n.3. And because the former Civil Forfeiture Statute could lead to no money going to the Fund, Appellant's App. Vol. II, pp. 45 ("State Defendants are not aware of any cases that a Marion County trial court awarded forfeited property to the Common School Fund."), even the actual-cost method cannot promise to "grow" or "increase" the fund. *See post*, at 6.

fund, by the collection of fines and forfeitures that are lost to the State under the present system." 14 Brevier Legis. Rep. App., p.7.

In 1879, this Court upheld the Act's compensation scheme. In *State v. Denny*, Attorney General Thomas Woolen sued the state's former attorney general, James Denny, "for the recovery of certain moneys belonging to the State." 67 Ind. 148, 148 (1879). The proceeds at issue consisted of commissions Denny had collected and retained, by authority of the Act, during his tenure in public office. *Id.* at 149–50. Woolen argued that Denny was not entitled to these proceeds because the Act limited the attorney general only "to the ascertainment . . . of the amounts paid to any public officer of the State." *Id.* at 157 (internal quotations omitted). This Court rejected Woolen's argument as "antagonistic" to legislative intent. *Id.* at 157. The purpose of the Act, this Court opined, was to recoup "large amounts of these public moneys, belonging to the State and its trust funds," which "were in the hands of State and county officers, and other persons, and had been there long beyond the time when, by law, **they should have been paid into the proper treasury**." *Id.* at 158 (emphasis added). For this reason, the Court concluded, the General Assembly properly authorized "liberal commissions for the Attorney General" and his assistants, "but **payable only . . . out of the amounts so collected**." *Id.* (emphasis added).

With no discussion of *Denny* in their briefings, Taxpayers rely instead on this Court's decision in *Bartholomew County v. State ex rel. Baldwin*, 116 Ind. 329, 19 N.E. 173 (1888). In that case, the board of county commissioners successfully sued the former township trustee to recover outstanding money due to the Congressional Township Fund, another distinct revenue source under article 8, section 2. *Id.* at 330–31, 19 N.E. at 174–75. Upon receipt of the proceeds, the board set aside $2,000 for its attorneys as a "reasonable fee and compensation," with the remainder paid to the Township Fund. *Id.* at 334, 19 N.E. at 176. The Attorney General, in turn, sued the board to recover the attorneys' fees, arguing that all proceeds were dedicated exclusively "to the support of common schools, and to no other purpose whatever." *Id.* at 336, 19 N.E. at 177. This Court agreed, holding that any revenue owing to the Congressional Township Fund "could not be diverted lawfully . . . to the payment of

attorney's fees," which included "the payment of fees and commissions to the attorney general." *Id.* at 339, 19 N.E. at 178, 179.

On first impression, *Baldwin* stands in clear tension with *Denny*. But a closer look at *Baldwin* reveals an important distinction. Unlike the contingent sources of revenue at issue in *Denny* (unclaimed property, fines and forfeitures, escheated estates), *Baldwin* involved the Congressional Township Fund, "one of the trust funds referred to in section 7 of article 8 of the constitution of 1851." *Id.* at 340–41, 19 N.E. at 179. In 1828, Congress had approved the General Assembly's request to sell these lands (which Indiana had acquired at statehood), but only with the consent of the township inhabitants (for whom Congress had expressly reserved these lands) and only on the condition that all proceeds "be forever applied to the use of the inhabitants of the respective townships in the **support of schools therein**."[23] *State v. Springfield Twp., in Franklin Cty.*, 6 Ind. 83, 93 (1854) (quoting Act of Jan. 24, 1828, ch. 80, 1827 Ind. Acts 112, 112) (emphasis added). Delegates to the 1850–51 Constitutional Convention codified these terms in the state's new fundamental law. Article 8, section 7 considers these sales proceeds as "trust funds" which the state must "faithfully and **exclusively** appl[y] to the purposes for which the trust was created." Ind. Const. art. 8, § 7 (emphasis added).[24]

Because the state holds these proceeds in trust for a particular beneficiary (the township inhabitants) and for a specific purpose (the support of township schools), the General Assembly has "no power to

---

[23] The Congressional Township Fund has its origins in the General Land Ordinance of 1785, which, in addition to establishing the systematic survey and sale of western lands, set forth the first program of land grants for schools. *See* Sally K. Fairfax et al., *The School Trust Lands: A Fresh Look at Conventional Wisdom*, 22 Envtl. L. 797, 805 (1992).

[24] The framers noted that the State held donated lands merely in trust. *See* 2 *Debates* at 1863 (statement of Mr. Pettit) (remarking that section 7 "is a simple declaration" that the state would "faithfully apply" those funds received "by gift, by donation—anything for a specific purpose"); *id.* at 1885 (statement of Mr. Dobson) (noting that the federal government donated the "Salt Springs" (the source of article 8's "Saline fund") and "every sixteenth section" of townships (the source of the "Congressional Township fund") for specific purposes).

divert the congressional township fund, or the income thereof." *Baldwin*, 116 Ind. at 338, 19 N.E. at 178. Unlike forfeitures and other contingent revenue sources (which vest in the Common School Fund as determined by the General Assembly), the Congressional Township "lands came to [the state] as a sacred trust," and "the people, by their fundamental law, have placed it **beyond the power of even the legislature**" to divert "the principal of the funds arising from such lands." *See Edgerton v. Huntington Sch. Twp.*, 126 Ind. 261, 264, 26 N.E. 156, 156–57 (1890) (emphasis added).[25] The *Baldwin* Court merely extended this prohibition to include the board of county commissioners. *See* 116 Ind. at 338, 19 N.E. at 178.

Finally, Taxpayers cite *Howard County v. State ex rel. Michener* in arguing that "this Court has 'always' held" that the Fund "'must be devoted to the support of the common schools, without the diversion from it of a penny for any other purpose whatever.'" Appellants' Br. at 28 (quoting 120 Ind. 282, 283, 22 N.E. 255, 255 (1889)). At issue in *Michener* was a statute requiring county auditors to conduct a full accounting of the Common School Fund. Act of Dec. 21, 1865, ch. 38, § 1, 1865 Ind. Acts 144. The "amounts thus ascertained" in their reports, upon approval by the Superintendent of Public Instruction, became "conclusive evidence of the facts therein contained." *Id.* § 2, 1865 Ind. Acts at 144. The attorney general challenged the measure as a violation of article 8, section 2. This Court agreed, reasoning that the statute impermissibly precluded "the courts from ascertaining" the "money due the school fund." 120 Ind. at 284, 22 N.E. at 255–56.

The holding in *Michener*—that article 8 requires a full and transparent accounting of all revenue owing to the Common School Fund, and that no "legislative contrivance" can prevent the courts from assessing this information—is entirely consistent with the legislative intent of the 1873 Attorney General Act. And nothing in that decision precludes pre-accrual offsetting. While today the "county auditor shall keep a record of all fines

---

[25] Article 8, section 2 limits legislative authority over only those Fund sources held in trust, not over contingent sources like forfeitures. Thus, article 8, section 2 does not limit "the legislature's authority in drawing the [S]tatute's contours." *See post*, at 5 (dissent).

and forfeitures and all other revenue that, by law, accrues to the fund," I.C. § 20-49-3-16(a) (2006), the Statute doesn't establish these records as "conclusive evidence" of the money owed the Fund. *See Michener*, 120 Ind. at 282, 22 N.E. at 255. Thus, the Statute is no "legislative contrivance" precluding "the courts from ascertaining" the "money due the school fund." *Id.* at 284, 22 N.E. at 256.

Altogether, the history of education funding in Indiana belies the Taxpayers claim that, by permitting law enforcement personnel to reimburse themselves for forfeiture-execution costs, "the Civil Forfeiture Statute enables precisely what Article 8 was meant to curtail." *See* Appellants' Br. at 32.

## C. Structure and Purpose of the Indiana Constitution.

Finally, the structure and purpose of our Constitution unerringly point toward article 8, section 2 permitting cost offset for forfeiture execution. We examine our Constitution's provisions "within the structure and purpose of the Constitution as a whole." *State v. Monfort*, 723 N.E.2d 407, 411 (Ind. 2000). When possible, we must construe these provisions harmoniously. *Id.*

Taxpayers contend that "Article 8, Section 2 shows that the framers knew how to authorize cost-recovery when they intended to do so." Appellants' Br. at 30. In support of this argument, they direct us to another source of revenue under section 2: proceeds from the "sales of Swamp Lands," which expressly permits expense deductions for "selecting and draining" those lands. *See* Ind. Const. art. 8, § 2.

But this language is yet another product of federal land-grant legislation. *See* Act of Sept. 28, 1850, ch. 84, § 2, 9 Stat. 519, 519. Although the Swamp Lands were "subject to the disposal of the legislature," Congress required the state to dedicate all sales proceeds "exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains." *Id.* In other words, the federal land grant contractually bound the State of Indiana to set aside "the expense of selecting and draining" the Swamp Lands before directing any remaining proceeds to

the Fund.[26] The framers simply codified this language in the state's fundamental law.

Free of similar offsetting restrictions, forfeitures and other contingent revenue sources under section 2 permitted the pre-accrual distribution of funds. This practice included the distribution of proceeds "derived from the sale of County Seminaries." *See* Ind. Const. art. 8, § 2. "It is a sufficient compliance with the constitutional requirement," this Court held, just four years after our constitutional framers adjourned, "if the seminary fund, **after payment of its debts**, is appropriated to common schools." *Auditor & Treasurer of Grant Cty. v. Bd. of Comm'rs of Grant Cty.*, 7 Ind. 315, 316 (1855) (emphasis added).[27]

Still, Taxpayers characterize *Grant County* as an anomaly, "an episode unique to Indiana's transition from the 1816 Constitution to the 1851 Constitution." Appellants' Reply Br. at 17. But a closer look at the constitutional debates suggests otherwise.

On January 27, 1851, Delegate Nathaniel Hawkins expressed support for directing the proceeds from county seminary sales to the Common School Fund. 2 *Debates* at 1851, 1867–68. But he questioned the prudence of omitting from section 2 "some provision by which the honest debts and proper liabilities of county seminaries shall be paid."[28] *Id.* at 1868. Because of this concern, Hawkins proposed an amendment which would have required the pre-accrual allocation of sales proceeds for the payment of

---

[26] The Swamp Lands weren't the only federal land grant under article 8, section 2. But of those sources, it was alone in requiring cost offsetting. For example, the federal grant of Saline Lands (the source of section 2's "Saline fund") required only that Indiana sell those lands at a specific price and to "apply the proceeds of said sale to the purpose of education." Act of July 3, 1832, ch. 155, 4 Stat. 558, 558.

[27] *Grant County* was the **first** case from this Court to discuss article 8, section 2.

[28] Delegate Hawkins represented Randolph, Jay, and Blackford Counties at the constitutional convention. 1 *History of Jay County* 92 (Milton T. Jay ed., 1922). Before that, Hawkins "represented the counties of Jay and Adams in the Legislature of Indiana" in 1842. *Id.* After the convention, Hawkins became the first judge of the Court of Common Pleas for Jay County before dying in October 1853. *Id.* Suffice it to say, Hawkins was well-entrenched in mid-nineteenth century Indiana politics.

"all claims against any of the county seminaries arising out of the donations for their construction." *Journal of the Convention of the People of the State of Indiana to Amend the Constitution* 807 (1851). But Hawkins' colleagues considered this constitutional proviso unnecessary, ultimately voting down the proposed amendment. *See* 2 *Debates* at 1868 ("Under this section they may take some of the school fund and pay their debts.") (statement of Delegate Erastus Bascom).

*Grant County*, then, unmistakably dispelled Delegate Hawkins' doubts over whether, without an express provision, "the debts will necessarily have to be paid out of the proceeds of the sale." To be sure, the debts at issue in that case amassed prior to constitutional ratification. *See* 7 Ind. at 315 ("The commissioners of Grant county undertook, in 1849, the building of a county seminary. . . [before] the new constitution was adopted."). But nothing in the Court's holding limits its application to only those debts owed at the time of article 8's adoption and ratification. And as this Court has long held, our decisions "contemporaneous with" constitutional ratification receive "strong and superseding precedential value." *Collins v. Day*, 644 N.E.2d 72, 77 (Ind. 1994) (citing *Lafayette, M. & B. R. Co. v. Geiger*, 34 Ind. 185, 213 (1870)).

To resolve any doubt, we find further support for this conclusion in legislation enacted in the years immediately following constitutional ratification permitting cost offset for various article 8, section 2 revenue sources. Under the 1852 Free School Law, the General Assembly mandated that "proceeds of the [seminary] sales, **after deducting the necessary expenses thereof and the amount due to individuals for advances as aforesaid**, shall be placed by the county treasurer to the credit of the common school fund, to be disposed of in such manner as shall be directed by law." Act of June 12, 1852, ch. 97, § 15, 1 1852 Ind. Acts 437, 439 (emphasis added). During that same legislative session, lawmakers enacted a measure permitting the pre-accrual distribution of proceeds from the liquidation of an heirless estate to "pay debts" owed by the decedent. Act of June 17, 1852, ch. 10, § 142, 2 1852 Ind. Acts 246, 281.

Together, these statutes demonstrate the legislature's long-standing right to permit offset before a forfeiture accrues to the Common School Fund.[29]

In addition to permitting pre-accrual debt offset for heirless estates, the Act of June 17 also directed the executors of those estates to hold the property "until the expiration of five years." *Id.* After this time passed, executors could sell the property, with any proceeds then vesting in the Fund. *Id.* It is this command that survived the attorney general's challenge in *Meyer* that the statute violated section 2's "escheated land" provision, which—like section 2's forfeiture language—lacks explicit language permitting legislative offsetting. *See* Ind. Const. art. 8, § 2 (directing the Fund to consist of revenue "derived from the sale of . . . [a]ll lands and other estate which shall escheat to the State, for want of heirs or kindred entitled to the inheritance"). In upholding this statutory scheme, however, the *Meyer* Court reasoned that the heirless property "never became a component part of the common school fund" because it had "never been sold as escheated lands." 63 Ind. at 40, 41. In effect, the decision affirmed the legislative prerogative to determine how and when certain property vests in the State, despite the lack of express constitutional language permitting such an arrangement. To absolve any lingering doubts over this authority, the *Meyer* Court emphasized that the statute was "enacted immediately after the adoption of the present constitution of this State, by a General Assembly," the members of which "had also been members of the convention which framed that constitution." *Id.* at 42–43.

For the reasons set forth above, our Constitution's structure and purpose refute Taxpayers' claim that, "if the framers had intended that the

---

[29] Additional legislation from the mid-nineteenth century allowed offsets from other contingent revenue sources intended for the Common School Fund. An 1857 statute, for example, set aside for an informant "one half" of a criminal fine imposed on persons hunting out of season, with the "other half" directed "to the common school fund." Act of Feb. 26, 1857, ch. 31, §§ 1, 2, 1857 Ind. Acts 39, 39. And in 1872, the legislature directed the proceeds from the sale of tax delinquent properties to "the common school fund of this State, **after deducting the expenses and charges of the sale**." Act of Dec. 21, 1872, ch. 37, § 207, 1872 Ind. Acts 57, 110 (emphasis added).

forfeitures clause authorize cost-reimbursement, they would have said so." Appellants' Br. at 31.

## Conclusion

We acknowledge the critical role public schools play in nurturing our children to become productive and law-abiding citizens. There is, after all, "a legitimate, and often a close, connection between ignorance and crime." Ind. Dep't of Public Instruction *Fourteenth (Third Biennial) Report of the Superintendent of Public Instruction for the State of Indiana* 52 (1866). But should the legislature decide to repeal the Civil Forfeiture Statute entirely, leaving neither the Common School Fund nor law enforcement with an important source of revenue, would that present Taxpayers with a constitutional claim? Would that violate article 8, section 2's mandate that the Fund "shall consist of . . . all forfeitures which may accrue"? We think the answer to these rhetorical questions is a resounding "no." "[W]hether it is good policy to do [so]," however, "is a matter with the legislature," not for this Court to decide.[30] *State v. Indiana & I.S.R. Co.*, 133 Ind. 69, 80, 32 N.E. 817, 820 (1892).

Because our constitution's text, structure, and history clearly show that article 8, section 2 was "not self-acting in [its] operation," *Meyer*, 63 Ind. at 40, we hold that the General Assembly may decide how and when forfeiture proceeds accrue to the Common School Fund.

Judgment affirmed.

Goff, J., concurs.

Rush, C.J., concurs in result in Part I, concurs in Part II, and dissents from Part III, with separate opinion in which Justice David joins in part.

---

[30] Today, the Common School Fund does not help directly finance our public schools. Instead, it is used to make "advances" to schools for various specified purposes. *See* I.C. 20-49-3-8.

David, J., concurs in result in Part I and concurs in Parts II and III.

Slaughter, J., concurs in the judgment with separate opinion.

ATTORNEYS FOR APPELLANTS

J. Lee McNeely

Cynthia A. Bedrick

Scott A. Milkey

McNeely Stephenson

Shelbyville, Indiana

Samuel B. Gedge

Wesley P. Hottot

Institute for Justice

Arlington, Virginia

Seattle, Washington

ATTORNEYS FOR APPELLEES TERRY CURRY AND THE MARION
COUNTY PROSECUTOR'S OFFICE

Curtis T. Hill, Jr.

Attorney General of Indiana

Thomas M. Fisher

Solicitor General

Kian J. Hudson

Patricia C. McMath

Julia C. Payne

Deputy Attorneys General

Indianapolis, Indiana

ATTORNEYS FOR APPELLEES CITY OF INDIANAPOLIS AND
MARION COUNTY, JOSEPH H. HOGSETT, PAUL BABCOCK, AND
BRYAN ROACH

Donald E. Morgan

Traci M. Cosby

Tara L. Gerber

City of Indianapolis Office of Corporation Counsel

Indianapolis, Indiana

ATTORNEY FOR AMICI CURIAE ACCELERATE INDIANA MUNICIPALITIES, INC. AND INDIANA MUNICIPAL LAWYERS ASSOCIATION, INC.
Mark J. Crandley
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE INDIANA SCHOOL BOARDS ASSOCIATION
Kent M. Frandsen
Parr Richey Frandsen Patterson Kruse LLP
Lebanon, Indiana

**Rush, C.J., concurring in part and dissenting in part.**

I take no issue with my colleagues' conclusion that the plaintiffs have standing as taxpayers, or with their analysis that Article 8, Section 2 applies to civil forfeitures.

I disagree with my colleagues, however, on two fronts. First, their broader discussion of the public-standing doctrine—properly characterized as dicta—is imprudent. It undercuts an important, long-recognized instrument for maintaining the separation of powers and checks and balances in Indiana, and it mistreats this Court's precedent. Second, I disagree that the current civil-forfeiture statute is constitutional. If the legislature enacts a civil-forfeiture scheme, the amount collected above the cost of obtaining the forfeiture must grow the Common School Fund. Here, the current statute's allocation scheme neither tracks offset costs nor increases the Fund. Thus, the legislature overstepped a constitutional limit on its authority.

I therefore concur in result in Part I, concur in full in Part II, and dissent from Part III.

## A. Standing

In my view, this Court's precedent in *Cittadine*, *Embry*, and *Meredith* secured the plaintiffs' standing as taxpayers. So, no further discussion of standing is necessary. Yet, the lead opinion, in dicta, engages in lengthy criticism of both the public-standing doctrine and this Court's precedent—criticism to which I cannot subscribe.

To start, the public-standing doctrine, properly limited, does not undermine the separation of powers. Rather, it serves an important role in maintaining the separation of powers, with checks and balances, in state government. While the general rule of standing certainly helps the judiciary refrain from wading into waters reserved for the other branches, the public-standing doctrine helps ensure that the legislature and executive do not go beyond the boundaries of their authority. *See State ex*

*rel. Cittadine v. Ind. Dep't of Transp.*, 790 N.E.2d 978, 979–82 (Ind. 2003). It allows the judiciary to step in when necessary to keep the branches within their limited spheres. *Id.*; *accord Sprague v. Casey*, 550 A.2d 184, 187 (Pa. 1988); *see also Project Extra Mile v. Neb. Liquor Control Comm'n*, 810 N.W.2d 149, 159–60 (Neb. 2012).

This is an essential function and duty of the judiciary—to preserve the structure of government established by the People through the Constitution. *Cf. Marbury v. Madison*, 5 U.S. 137, 180 (1803) (observing responsibility of courts to the Constitution); *City of Arlington v. FCC*, 569 U.S. 290, 327 (2013) (Roberts, C.J., dissenting) (observing judiciary's obligation "not only to confine itself to its proper role, but to ensure that the other branches do so as well"). Preserving that structure depends on effectively checking unconstitutional exercise of authority. *See* The Federalist Nos. 48 (James Madison) & 51 (Alexander Hamilton or James Madison). And the public-standing doctrine enables such a check in state government: it permits the People to procure the enforcement of a public right by invoking the judiciary's guardianship of the Constitution when the constitutional structure has been compromised.

The absence of a comparable public-standing doctrine in the federal system is not a reason for us to eliminate this long-standing feature of Indiana law. *See, e.g., Hamilton v. State ex rel. Bates*, 3 Ind. 452, 458 (1852). Structural differences between the federal and state governments may call for different standing requirements. After all, the federal government has only the powers enumerated in the Federal Constitution. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475–76 (2018). State government, by contrast, has plenary power, limited only by the restrictions imposed by the federal and state constitutions. *Id.* When a state constitution imposes a limit on that power, less stringent standing demands may be necessary to keep government actors within their proper domains. Indeed, like Indiana, many other states have recognized that public standing has a rightful place in state law. *See Cittadine*, 790 N.E.2d at 982–93.

Apart from my disagreement over the public-standing doctrine's role in maintaining the structure of and checks on our state government, I believe the lead opinion misrepresents, misreads, and maltreats this

Court's decisions in *Pence*, *Cittadine*, *Embry*, and *Meredith*. It sees these opinions as presenting "doctrinal obfuscation" and "ostensibly competing theories" on the public-standing doctrine. Slip op. at 13–14. And it gives *Cittadine* "no precedential weight," *id.* at 16, while also treating Justice Dickson's *Embry* opinion on standing as a plurality opinion, *id.* at 12, even though it garnered a majority, making it the Court's opinion. I view these cases differently.

As a threshold matter, standing involves a general rule and an exception to that rule. The general rule is that the plaintiff must show a private injury, which is a harm different from that suffered by the general public. The exception is the public-standing doctrine. It is an exception because the plaintiff must show a public, rather than a private, injury. This doctrine has limits. And this Court has recognized some of them, including a requirement of extreme circumstances.[1] The Court has also recognized a category of public standing: taxpayer standing. This category applies when the plaintiff is a taxpayer challenging a legislative enactment as exceeding a specific constitutional limit on the exercise of the legislature's power over the state purse.

This Court applied the general rule of standing in *Pence v. State*, 652 N.E.2d 486 (Ind. 1995). In that case, Justice Dickson believed the exception, rather than the rule, should have applied. *Id.* at 489 (Dickson, J., dissenting). The Court then unanimously applied the public-standing exception to the motorist–plaintiff in *Cittadine*, 790 N.E.2d at 984, explaining that the general rule applied in *Pence* because the circumstances of that case called for cautious restraint in the Court's exercise of judicial discretion. *Cittadine*, 790 N.E.2d at 983. In other words, in *Pence*, the reasons for applying the general rule outweighed the reasons for applying the exception. *Cf. Green v. Obledo*, 624 P.2d 256, 267 (Cal. 1981) (in bank) ("[T]he policy underlying the exception may be

---

[1] As I understand the public-standing doctrine, "extreme circumstances" include situations in which dispensing the general standing requirements serves to maintain the separation of powers or is necessary to check whether a government actor has overstepped a specific boundary to its authority.

outweighed in a proper case by competing considerations of a more urgent nature . . . ."). The Court in *Cittadine* also explained both that "*Pence* did not alter the public standing doctrine in Indiana" and that the doctrine, though subject to limits, "continues to be a viable exception to the general standing requirement." 790 N.E.2d at 983.

Next, in *Embry*, a majority[2] of the Court relied on *Cittadine* to apply the public-standing exception to the taxpayer–plaintiffs. *Embry v. O'Bannon*, 798 N.E.2d 157, 159–60 (Ind. 2003). The Court later relied on this *Embry* majority in *Meredith*, when it unanimously observed that the exception applied to the taxpayer–plaintiffs. *Meredith v. Pence*, 984 N.E.2d 1213, 1217 n.4 (Ind. 2013).

Thus, *Cittadine* is precedential; the Court's *Embry* opinion on standing is precedential; and to the extent *Cittadine* **may** conflict with *Pence* in applying the public-standing exception instead of the rule, *Cittadine* controls as the more recent and still-precedential decision. Ultimately, I see no "doctrinal obfuscation" in these cases—they indicate that taxpayer standing is a category of public standing, and that public standing applies only when cautious judicial restraint is outweighed by the need for the Court to ensure government actors stay within the confines of their authority.

Under this Court's decisions in *Cittadine*, *Embry*, and *Meredith*, the plaintiffs here have public standing under the taxpayer category: they are taxpayers who have alleged a public harm caused by legislative action

---

[2] My colleagues appear to treat Part I of Justice Dickson's opinion in *Embry* as a two-justice plurality: Justice Dickson joined by Justice Rucker. But Justice Sullivan explicitly concurred with this part. *Embry v. O'Bannon*, 798 N.E.2d 157, 167 (Ind. 2003) (Sullivan, J., concurring in part 1 and concurring in result in part 2) ("I concur in part 1 of the Court's opinion[.]"). True, Justice Sullivan wrote separately. But his separate concurrence did not alter his concurring vote with Justice Dickson's opinion on standing; it simply gave "more detailed attention" to that issue. *Id.* And although Justice Boehm voted "concur in result" for the opinion as a whole, he wrote, "I agree with the majority in the portion of its opinion concluding that plaintiffs have standing to assert their claims." *Id.* at 169 (Boehm, J., concurring in result). So, the standing portion of Justice Dickson's *Embry* opinion garnered a majority with at least three— and possibly four—votes.

that exceeds a specific constitutional limit on the legislature's authority over the purse—a limit this Court is responsible for safeguarding against legislative overreach. Since the plaintiffs have standing under that category, the lead opinion's broader discussion of the public-standing doctrine is dicta. And it is dicta that imprudently drives a knife into not only the heart of the judiciary's duty to ensure that each branch of government stays within its assigned lane, but also this Court's precedent and integrity as a decision-making institution.

## B.    Constitutionality of the Civil-Forfeiture Statute

In my view, Article 8, Section 2 imposes a condition on civil-forfeiture legislation: all forfeitures, save offset costs, must go to the Common School Fund. And because the current civil-forfeiture statute does not designate to the Fund all forfeitures, above the costs of obtaining them, it is unconstitutional.

My colleagues reason that since the legislature may enact no civil-forfeiture statute at all, it must have unlimited authority to determine whether, when, and how a forfeiture "accrues" under Article 8, Section 2. But that reasoning doesn't add up.

A constitutional provision that is "not self acting" can still limit governmental action. Put differently, the legislature may refrain from enacting a civil-forfeiture statute—but if it chooses to enact one, the Constitution may limit the legislature's authority in drawing the statute's contours. I believe Article 8, Section 2 does just that.

The text, structure, and history of Article 8, Section 2 suggest that only the portion of a forfeiture that exceeds the cost of collecting it accrues to the Fund. So, I would hold that "all forfeitures which may accrue" in Article 8, Section 2 is all civil forfeitures minus offset costs necessary to obtain each forfeiture. In other words, to the extent my colleagues hold that expenses incurred in obtaining the forfeiture are not part of a forfeiture that accrues, I agree.

But Article 8, Section 2 does not permit allocations **apart from** offset costs. To the contrary, offset costs, including incentives necessary to collect

the forfeiture, prevailed in Indiana's past[3] because they were a means to increase the Fund. *See, e.g.*, Act of Mar. 10, 1873, ch. 7, §§ 2, 9, 11, 1873 Ind. Laws 18, 18–20. This Court has never held that a civil-forfeiture statute is constitutional even though the allocations bear no correlation to expenses incurred in obtaining the forfeiture.

Here, under the current civil-forfeiture statute, any contributions to the Fund are not guaranteed and are capped at ten percent of the collected forfeiture. Without any showing that the allocations are offset costs of obtaining each forfeiture and that those offset costs serve to grow the Fund, the permissibility of offset costs does not save the statute from constitutional infirmity. Therefore, because the statute's allocation scheme does not increase the Fund or demonstrate a tie to expenses incurred in obtaining each forfeiture, the statute is unconstitutional.

True, the plaintiffs here argue that Article 8, Section 2 permits no diversions from forfeitures, including offset costs. This argument goes too far. But the legislature also went too far. And it is our duty to ensure that each branch of government stays within the constitutional bounds of its authority. The majority's holding—that Article 8, Section 2 permits the legislature to essentially define "accrue"—not only makes that portion of

---

[3] Whether each of those allocation schemes was constitutional is less clear to me than to the majority. This Court never decided the constitutionality of those schemes. For example, in *State ex rel. Attorney General v. Denny*, the constitutionality of the statute was not before the Court. 67 Ind. 148 (1879). Rather, the plaintiffs contended that the former attorney general's actions violated the statute, and the Court addressed only that contention. *Id.* Similarly, *State v. Elliott* was a divided opinion in the Court of Appeals, not a decision of the Indiana Supreme Court, and it did not directly address the statute's constitutionality under Article 8, Section 2. 171 Ind. App. 389, 357 N.E.2d 276 (1976). That case concerned a plaintiff's attempt to recover funds that a judge had determined were mistakenly forfeited in the first place. *Id.* at 390, 357 N.E.2d at 277. The disagreement in the court was about whether that judicial determination permitted the plaintiff to recover the funds after they had arrived at their final destination, in the Treasurer's hands. *Id.* at 391–93, 357 N.E.2d at 277–79. The majority determined that was too late, because by the time the Treasurer had the funds, "such funds had clearly accrued to the Common School fund and could not properly be recovered," *id.* at 393, 357 N.E.2d at 279. This conclusion, like the Court's decision in *Denny*, did not establish the statute's constitutionality under Article 8, Section 2. And each decision is far from a determination by this Court that the legislature has unlimited authority to define whether, when, and how accrual of a forfeiture occurs.

the Constitution hollow; it also upsets the judiciary's vital role to interpret the Constitution.

I therefore concur in part and dissent in part.

David, J., joins in Part A.

**Slaughter, J., concurring in the judgment.**

I agree with the Court that the judgment below for Defendants and against Plaintiffs must be affirmed. But I reach that result for different reasons. I would hold that Plaintiffs lack standing under the only standard consistent with our Constitution's mandate of separate governmental powers. In my view, Article 3, Section 1 requires, among other things, that a plaintiff suffer individualized injury in fact and not a generalized harm indistinct from the public at large. Our prevailing judicial doctrines that permit taxpayer and citizen (also known as public-interest) standing are incompatible with this constitutional command. Although I have serious concerns with the way Indiana carries out civil forfeitures, see generally *Leonard v. Texas*, 137 S. Ct. 847 (2017) (Thomas, J., respecting denial of certiorari), I would not reach the merits of Plaintiffs' constitutional claim. Instead, I would dismiss their complaint for lack of standing and await another case—brought by the State or by a private party with a concrete, particularized injury—to address the important constitutional questions that this and other civil-forfeiture cases implicate.

I.

Standing is an essential aspect of justiciability, which concerns the propriety and power of a court to hear a case and award relief. It also is central to separation of powers—the disbursal of governmental power among the three separate branches. A correct view of standing ensures that the complaining party is invoking the "judicial power", properly understood, and not asking the judiciary to ignore our constitutional structure or perform functions belonging to another branch.

As James Madison explained in The Federalist No. 47, the principal reason for separating governmental power was to protect liberty and avoid tyranny. "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." In the same essay, Madison addressed the threat to liberty if courts did not confine themselves to exercising judicial power. "[T]here can be no liberty … if the power of judging[] be not separated from the legislative and executive powers[.]"

Madison's concerns are reflected in our own Indiana Constitution, which divides state government into "three separate departments": "the Legislative, the Executive including the Administrative, and the Judicial". Ind. Const. art. 3, § 1. No official within one department "shall exercise any of the functions of another, except"—and this is a key qualification—"as in this Constitution expressly provided." *Id*. In other words, the only permissible deviation from strictly separate governmental powers arises when the Constitution itself permits it. One implication of this rule is that courts cannot exercise the distinct powers allocated to the other branches.

Our Constitution assigns to courts the responsibility for exercising the "judicial power": "The judicial power of the State shall be vested in one Supreme Court, one Court of Appeals, Circuit Courts, and such other courts as the General Assembly may establish." *Id*. art. 7, § 1. This delegation of the judicial power prompts this central question: What, precisely, are the contours of the "judicial power", which only courts may exercise? The answer begins with a proper conception of standing, which permits courts to adjudicate a claim only to the extent the plaintiff has sustained an actual injury and seeks to vindicate a private right.

## A.

As we have recognized, standing is a "threshold" question for the courts, *Pence v. State*, 652 N.E.2d 486, 487 (Ind. 1995), and a "key component in maintaining our state constitutional scheme of separation of powers." *Id*. at 488. Standing imposes a "significant restraint on the ability of Indiana courts to act" because it "denies the courts any jurisdiction absent an actual injured party participating in the case." *Id*. This requirement of an "actual injured party" is not merely a prudential matter that courts can enforce or ignore as they see fit. It is, rather, a mandate that flows necessarily from our constitutional scheme of divided governmental powers.

We observed in *Pence* that, unlike the federal Constitution, our state Constitution has no explicit "case or controversy" requirement. *Id*. That remains largely true today, except for a 2018 amendment to Article 10, Section 5. But despite the lack of a general case-or-controversy mandate, "our explicit separation of powers clause fulfills a similar function." *Id*.

Thus, the requirement of a case or controversy is implicit in our Constitution's express separation-of-powers mandate.

Just last year, the People amended our State Constitution to require the general assembly to adopt a balanced budget unless two-thirds of each legislative chamber vote to suspend the requirement. Ind. Const. art. 10, § 5(f). The amendment also provides specific judicial remedies for enforcing the provision and, relevant here, appears to contemplate that any such remedy must arise in connection with a "case or controversy".

> A court that orders a remedy pursuant to any case or controversy arising under this section may not order any remedies other than a declaratory judgment or such other remedies that are specifically authorized by the General Assembly in a law implementing this section.

*Id*. art. 10, § 5(g). Because our recent standing precedent has ignored the implicit case-or-controversy requirement within Article 3, Section 1, it is noteworthy that this amendment leaves no doubt that a plaintiff's generalized injury will not suffice to confer standing.

Our standing case law holds it is insufficient that a plaintiff merely has a general interest common to all members of the public. "[O]nly those persons who have a personal stake in the outcome of the litigation and who show that they have suffered or were in immediate danger of suffering a direct injury as a result of the complained-of conduct will be found to have standing." *State ex rel. Cittadine v. Indiana Dep't of Transp.*, 790 N.E.2d 978, 979 (Ind. 2003) (citations omitted). But we stray from our requirement of an actual or imminent direct injury when claimants seek to enforce **public** rights or interests. "[W]hen a case involves enforcement of a public rather than a private right the plaintiff need not have a special interest in the matter nor be a public official." *Id*. at 980 (citations omitted).

## B.

The Court's opinion today treats public standing and taxpayer standing as "distinct", though the Court acknowledges some degree of "overlap" between these two doctrines. Public standing refers to a private litigant's

enforcement of a public right—often challenging governmental action believed to be illegal or unconstitutional. Taxpayer standing refers to a private litigant's specific kind of legal challenge—usually to an allegedly unlawful appropriation or expenditure of public funds. See *Embry v. O'Bannon*, 798 N.E.2d 157 (Ind. 2003).

On this point, I am closer to the Chief Justice's view that taxpayer standing is a "category" or subset of public standing. The strong interrelationship, however, between public and taxpayer standing does not save either doctrine but condemns them both. The Chief Justice notes that these doctrines—court-created exceptions to actual-injury standing— are not new to our jurisprudence but a "long-standing feature of Indiana law". That is true. But the long lineage of these exceptions does not make their pedigree noble.

When courts entertain a plaintiff's claim to vindicate a public right, we disrespect a key portion of the foundational bargain that "WE, the People of the State of Indiana" struck. Ind. Const. pmbl. In 1816 and again in 1851, the People exercised "the right to choose our own form of government", *id.*, and could not have been clearer that they were vesting the "executive power of the State" not in the courts or in private citizens but "in a Governor", *id.* art. 5, § 1, whose most solemn duty is to "take care that the laws are faithfully executed." *Id.* art. 5, § 16. When we confer standing on citizens having no particularized injury and whose only interest in the case is their shared, common interest "with other citizens in the execution of the law", *Wampler v. State ex rel. Alexander*, 148 Ind. 557, 572, 47 N.E. 1068, 1072 (1897), we invade the executive's peculiar power, conferred by the People, to execute or enforce the law. Stated differently, courts disregard the governor's authority when we entertain suits by plaintiffs whose only claim is a generalized grievance indistinct from that of the public at large. Such a public-right claim to enforce the law should be brought, if at all, by the executive. A proper view of standing respects separation of powers by limiting courts to adjudicating only those disputes involving aggrieved parties with an actual, particularized injury.

C.

The Supreme Court of the United States, in *Lewis v. Casey*, 518 U.S. 343 (1996), explained the courts' role this way, describing both what that role is and what it is not:

> It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.

*Id*. at 349. *Lewis* thus reinforced the long-settled notion—dating at least to *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)—that "[t]he province of the court is, solely, to decide on the rights of individuals". *Id*. at 170. The "rights of individuals", thus understood, do not mean public rights belonging generally to the public at large. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992).

This view of the judiciary's limited role is not confined to the federal courts. In Indiana, this same understanding—that courts vindicate only private rights—dates at least to the mid-nineteenth century and predates our current 1851 Constitution. We held in *Brewington v. Lowe*, 1 Ind. 21 (1848), that "[c]ourts of justice are established to try questions pertaining to the rights of individuals." *Id*. at 23. We went on to explain that a court's authority extends only to the vindication of individual rights "directly affecting the parties litigant".

> [U]nless some individual right, directly affecting the parties litigant, is thus brought in question so that a judicial decision becomes necessary to settle the matters in controversy between them relative thereto, the Courts have no jurisdiction; and it would be a perversion of the purposes for which they were instituted, and an assumption of functions that do not belong to them, to undertake to settle abstract questions of law in whatever shape such questions may be presented.

*Id.*

*Brewington*'s modest view of the judicial role is not due to a stricter separation of powers under the 1816 Constitution. In words and substance, that charter's separation-of-powers mandate—contained in Article II—is no stricter than what prevails today. Like its 1851 counterpart, the 1816 version also created a tripartite system of governmental powers, prevented one department from exercising the powers of another, and said the only exceptions are those contained in the Constitution itself.

> The powers of the Government of Indiana shall be divided into three distinct departments, and each of them be confided to a separate body of Magistracy, to wit: those which are Legislative to one, those which are Executive to another, and those which are Judiciary to another: And no person or collection of persons, being of one of those departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

1816 Ind. Const. art. II.

These federal and state authorities all point in one direction. They establish that Indiana's prevailing standing jurisprudence, reflected in cases such as *Cittadine* and *Embry*, violates separation of powers because it authorizes courts to adjudicate claims premised not only on private rights but also on public rights—whether asserted as public or taxpayer standing. We must return the judiciary to the limited role the People fashioned for us—adjudicating only those claims consistent with our constitutional structure. A necessary step is to limit standing accordingly.

D.

Standing is a core principle for identifying those disputes that are properly resolved in the courts. The judiciary must be vigilant in self-policing how we discharge the judicial power, lest we intrude on the powers of the other branches. The only concept of standing consistent

with separate governmental powers requires the plaintiff to prove actual injury, causation, and redressability.

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (cleaned up). In addition to being constitutionally compelled, this test has the added virtue of providing clear rules for litigants and lower courts to identify who can invoke the judicial power—and, just as important, who cannot.

This approach stands in stark contrast to our recent standing rules, which have been anything but clear. In *Pence*, we recognized a narrow exception to injury-in-fact standing in "extreme circumstances", 652 N.E.2d at 488, without specifying what that means or how it applies. More recently, in *Cittadine*, we relaxed that standard further and held that exceptions to traditional standing are not limited to extreme circumstances but reflect "our exercise of judicial discretion with cautious restraint under the circumstances." 790 N.E.2d at 983. The assurance that we will exercise our discretion "with cautious restraint" is no restraint at all. Such a standardless benchmark for exercising the judicial power undermines the rule of law and amounts to an elastic, "we-know-it-when-we-see-it" yardstick that leaves standing principles open to the pleasure of courts. Yet courts are as susceptible as other human institutions to self-aggrandizement and the temptation to arrogate to ourselves power that properly belongs with others.

Our fundamental law, ratified by the People in 1816 and again in 1851, recognized these risks. That is why these charters imposed strict limits on

the exercise of governmental power, including the judicial power. And the only permissible exceptions to these strict limits were those each Constitution specifically authorized. Because courts have ultimate responsibility to say what the law is, we must be especially vigilant in resisting the allure of expanding our own authority by encroaching upon the power that the People committed to another branch.

Our prevailing "come-one-come-all" approach to public and taxpayer standing does not, contrary to the Chief Justice's view, "maintain" separate governmental powers but undermines them. Our precedent authorizing generalized-injury standing, which the Chief Justice defends, proceeds from the erroneous premise that the only remedy for reining in an executive or legislature that has "overstepped" its legal authority lies with the courts. But not every legal wrong has a corresponding judicial remedy. Courts have no business entertaining suits to enforce the law brought by claimants lacking an actual, particularized injury. The recourse for such persons lies not in the courts but in the court of public opinion—meaning the electoral process and, ultimately, the ballot box. Such persons must make their case elsewhere—before politically accountable officials. As just one example, if unconstitutional legislation is threatened, those seeking to vindicate the public interest can petition the legislature not to enact it; they can persuade the governor not to enforce it; they can lobby the attorney general not to defend it. What they cannot do—unless the legislation aggrieves them personally—is obtain relief from the courts. This limitation on the role of courts is not a weakness of our system but one of its central strengths.

E.

I take seriously the strong pull of *stare decisis*. But if a prior decision is clearly wrong, we have no legitimate basis for perpetuating the error. Our obligation as state judges is to support, among other things, the "Constitution of the State of Indiana", not the erroneous judicial decisions interpreting it. I would revisit our standing precedent to the extent it permits claimants alleging only a generalized injury to vindicate public rights. That precedent cannot be reconciled with the system of divided

governmental powers the People ratified in both our 1816 and 1851 Constitutions.

## II.

Applying these principles here requires that we dismiss Plaintiffs' complaint. Police initially seized two of Plaintiffs' vehicles, belonging to the Horners, and the local prosecutor sought to forfeit them, claiming the Horners had used them to transport marijuana. The vehicles were eventually returned after the prosecutor dismissed the underlying criminal charges. The Horners and others later sued, alleging that Indiana's civil-forfeiture statute unlawfully diverts forfeiture proceeds from the common-school fund. Plaintiffs do not claim to have sustained an actual, particularized injury from the allegedly unlawful diversion of forfeiture revenues. To the contrary, they acknowledge their standing is based on their status as "citizens and taxpayers" of Indiana, meaning their purported injury is indistinct from that of the public at large. The judicial power, properly understood, does not extend to such generalized grievances. We should dismiss Plaintiffs' complaint and not reach the merits of their constitutional claim.